Good morning ladies and gentlemen. Our first case for argument this morning is Instant Technology v. DeFazio. Good morning, Your Honors. I'm going to discuss just really one issue today at this time and rely on the briefs for the remaining points. But I'm going to discuss what I think is the most important and likely dispositive issue on this appeal. And that is whether the decision in the lower court that said that the restrictive covenants that were at issue, the non-solicitation agreements, were unenforceable because they lacked a protectable interest. Did the court use the right legal standard in making that decision? That is the key issue in this case. Illinois Supreme Court in 2011 in the reliable case changed Illinois law. It said that no longer are we going to be limited to just two protectable interests. Prior to reliable, in order to uphold a restrictive covenant, a non-compete or non-solicitation, the plaintiff had to prove near permanent customer relationships was a term of art, difficult to prove, was not the same as goodwill, or truly confidential information, strict confidential information, essentially information under the Trade Secrets Act. If you didn't have one of those, one or the other, you couldn't enforce your restrictive covenant. Reliable said no. Specifically said that test is gone. It doesn't mean that if you have a near permanent relationship, that's bad. No, if you can show the old near permanent relationship or the old confidential information, you have a legitimate interest to uphold a non-compete inquiry. It's not dispositive. You have to look at the totality of the circumstances in order to determine whether the case before the court has, the employer has a legitimate interest to protect through a restrictive covenant. The totality of the circumstances. Court said there's no, that you can look at various factors, but they're not dispositive. They're not exclusive. And essentially right now, we have a blank slate in Illinois as to what constitutes legitimate interest in which to uphold a restrictive covenant. There's very little, virtually no law on that discussion. What we do know is you can't simply end the inquiry if you didn't find near permanent relationships or confidential information. But that is exactly what Judge Holderman did. And you can make, that is very clear. If you look at his, his statement, which is an appendix from his opinion, appendix page 32, and I'm quoting, instant did not prove a near permanent relationship between instant and its clients, nor did instant prove the employee defendants gained access to The court finds the restrictive covenants are invalid and unenforceable. If we take those three sentences in isolation, I can see how you make that argument. But we have detailed findings, thorough discussion of extensive evidence. What did he overlook? He looked at, I'll tell you what he overlooked. He overlooked that those factors, the evidence, whether they by themselves, even if they don't show a near permanent relationship, even if they don't show strict confidential information, whether they constitute by the totality of the circumstances. I'm looking for something more specific. What did Judge Holderman miss? He missed the right legal... He obviously had read Reliable Fire. He cited it a number of times in his opinion. He thought he was applying it. So what did he miss that we need to fix? He looked at the facts. He missed, for instance, he conflated the information regarding clients and information with respect to candidates. He missed the fact that the evidence shows that there was significant not readily available information with respect to these candidates. Instan is a niche staffing business. They get fine IT professionals. They spent significant time and effort developing not just clients, but candidates. They tested these candidates. They hired experts to test the candidates, to determine their skills and problem solving. Presumably they add value to the process. That's what they get paid for. But particularly in light of Judge Holderman's detailed findings about how information in this industry becomes stale very quickly, it's a little hard for me, at least, to disagree with him. Judge, that's really the point. The point is he looked at these facts through a lens of the old law. He did not look at them to determine if, like other states, the goodwill relationship or the relationship with the clients and the candidates and Instan itself was sufficient. Other states recognized that relationship. In fact, Judge Holderman made a comment. He said that the clients, the court actually found this. You can find this on the appendix, page 30. He said clients generally did business with whom they had relationships. Those relationships, that was the end of his quote, those relationships were developed on Instan's time and at Instan's expense. He did not ask this question, whether those relationships, although not permanent under the old law, whether those relationships were a sufficient interest of the company to protect. If he had analyzed it that way, he would have gone, I believe, the way most states have gone, that when your sales staff develop personal relationships, goodwill relationships, you can protect those through a restrictive covenant. Judge Holderman never made that determination. He never asked that question. He just said these don't show near permanent relations. These facts do not show strictly confidential information. It's the wrong legal test. On the customer relationships, I've got to say, I used to do a lot of this stuff, this kind of litigation. I don't think I'd ever seen covenants in a case like this in an industry like this where there's no apparent loyalty by clients. They work with five or six or ten placement agencies. So it's a little hard to see that kind of goodwill bond here. Well, Judge, the staffing industry, prior to Reliable, found the way that you found. They certainly, those relationships do not show up as near permanent relationships under the old law. There's no question about that. Facts here, though, indicate it. And Judge is right. They were required to develop relationships. They had lunches, they dined them, they took them to ball games, they had social events, they had happy hours. They were required to develop relationships and they were developed over time. That doesn't mean they're exclusive. That doesn't mean that they don't use other people. But I don't know of any other state that would require the strict requirements of near permanent relationship that Illinois did. And the fact is, is we don't know right now. There hasn't been a lot of law developed about what the totality of circumstances mean. But we know what it doesn't mean. And what it doesn't mean is what Judge Holderman did here. You can't get away from the fact that he only judged these facts through his own lens of near permanent relationships and confidential information. And in confidential information... I'm concerned about your statement that we're working with a blank slate here. Both because obviously our job is simply to predict as best we can what the Illinois Supreme Court would do with this question. But also because this is an area of law, restrictive covenants, where predictability is incredibly important to both sides. To the employee who's thinking about departing, to the employer who's trying to keep employees, or to a new employer who is. And if we've got this blank slate totality of the circumstances test in Illinois, how does anybody advise a client with any confidence whether a covenant will be enforced? Very difficult. And in fact, a lot of the writings in the blogs and articles after Reliable raise the point that Your Honor raises. But that doesn't change the fact that that's what the Illinois Supreme Court did. They specifically said, we are not going to rely on those two. They specifically said there's a lot of factors, but we can't imagine all the factors that are to be considered. That has to be worked out. Predictability may be a problem now. I don't say it's not. But it's a problem that the Illinois Supreme Court recognized and didn't care. Or still said that the fairest way is to look at the totality of the circumstances. Having said that, we have some general idea. There's still predictability here. There's still predictability. You need some legitimate interest, probably some unique qualification in the employee. You look around the country, what they use. Goodwill is something that most states use. Unique qualifications of an employee is another factor. The business information, even though it may not be technically fit under the Trade Secrets Act, we have valuable business information here, which the record shows companies pay $10,000 a month to get the same kind of information that Instant had developed with respect to its candidates. Information which Defendant Meek admitted that she intended to use because it would be easier than compiling it herself. Frankly, that should be sufficient secret business information that could be protected. Whether or not it has a six-month life or a three-month life, it certainly is very valuable to a startup, which is what happened here. Connect was a startup and all of a sudden, within two months after they're up and running, they're doing business and they're getting significant business from our clients, from Instant's clients. There is no way that could have happened but for the fact that they had access to and used this information and had the relationships. They had those relationships. I will not say that this... I'm sorry. On the question of consideration, which comes into play here, do you think the Fifield case was decided correctly? Your Honor, I argued that case. I won that case. Now, like Abraham Lincoln, who was for the Illinois Supreme Court and said, Mr. Lincoln, weren't you here two months ago arguing the opposites point? And he said, yeah, but two months ago I was wrong. Here's what I think. I think there's good arguments on both sides. In Fifield, I argued for predictability. I argued that the two years, we need that bright line because then everybody knows what's going on and a company can't hire somebody and then fire them at the last minute. I think there's good arguments for it. There's good arguments against it and I recognized even at the time. I think ultimately the Illinois Supreme Court, if it takes this case, and it did not take Fifield, but if it takes it, it will probably apply its totality of circumstances to consideration. So I think it's close. You can argue both sides, but my feeling now is that the Illinois Supreme Court eventually will, as most of the district court judges have ruled so far, it will go with, it will apply totality of circumstances to the consideration issue. So you were persuasive, but you were wrong. I was persuasive, but I was wrong. Although we don't know yet. It's really up for this court to determine. And I have another question about the Illinois Supreme Court. Why do you think the Illinois Supreme Court might reject the view that in order for employment to be considered adequate consideration, an employee must work for at least two years? I'm sorry judge, what, you're asking why would it reject that? Yes. Well the reason for that is a situation that comes up, and this is what a lot of the people in the practitioners of the field talk about. What happens to somebody who works one year, 11 months, and 29 days, and then he or she quits. Technically under Fifield, that restrictive covenant would disappear. Now there could be arguments, there could be an implied duty of good faith and fair dealing where somebody quitting at that time might not get the benefit of it. That that's certainly a possibility, but there is problems with Fifield. There's problems with the bright line, and there's problems without a bright line. What we have seen is the Illinois Supreme Court in this area, in the area of restrictive covenants, seems to be going not to bright lines. It's not doing, they're getting rid of some of the predictability, but they're doing it because they think the totality of the circumstances is fairer to both sides. And then the courts have to determine within the totality of circumstances whether it was adequate consideration or whether it wasn't. But keep one thing in mind, even if the court were to follow Fifield, and even if the Seventh Circuit believes the Illinois Supreme Court would follow Fifield, it only affects three of the defendants here. Yeah, could I just ask you one other question about this issue of predictability? You obviously and your opposing counsel know Illinois non-compete law far better than I do, but have the Illinois courts recognized in essence the interorum effects that these covenants have? Yeah, and the way it comes out... And that's where this uncertainty winds up being especially troubling. But here's where it comes up where they recognize it. I'm not sure they do it exactly in your situation that you're talking about, but Illinois courts allow restrictive covenants to be modified if they're overly broad. But not if basically they're done, if the employer is overreaching. I always like to do it with it showing with my hands. If the restrictive covenant is this big and you wrote it this big, the court will modify it slightly. But if you did it for the interorum effect, if the employer did it for an interorum effect, there is a very good chance that restrictive covenant will be thrown out completely for being overly broad and they will not modify it. Thank you. Obviously my time is up. I hope to reserve five minutes for rebuttal. You've used your rebuttal time, counsel. Pardon, sir? You've used your rebuttal time. Well, thank you. Thank you. Mr. Wood, before you begin, I probably should have said this right at the outset. I've noticed that the University of Chicago is a client of both sides. And I, of course, teach part-time at the University of Chicago. I thought about this since the University of Chicago's interests don't appear to be implicated in any way in this litigation. I have thought that my recusal is not required. But if either of you has a different view about that, you should let me know soon. Okay? Thank you, Your Honor. Hal Wood, Your Honors. I represent the athletes and the cross-appellant in this matter. Turning to the issue of whether or not the district court applied the totality of the circumstances standard, it seems to me that the first thing we need to look at is simply what the district court said it was doing at the time. And the district court clearly and repeatedly referenced the reliable fire standard, relied on the totality of the circumstances standard, said it was applying that standard, went through roughly 20-some pages of both stipulated and determined facts that the district court determined after a six-day trial. And in no time during that trial, oftentimes, I think in a case where there's an issue of what standard was used, there would have been some evidence excluded or some findings that limited or focused the trial in a certain way to a certain standard. There was none of that even suggested by the appellant here. There was no limitation due to any other standard because there was no other standard applied other than the totality of circumstances, which is what the district court said it was applying and we think did apply. And I think the best view of that is in that paragraph that counsel read one sentence or one of two sentences out of, but really that paragraph, which is on page 32 of Judge Holderman's memorandum opinion, starts by saying in light of the foregoing facts and circumstances, the court finds that instance failed to prove by preponderance of the evidence that the covenants were not greater than required to protect what instance legitimate business interests. That in light of the foregoing facts and circumstances to the 20 or so pages of facts and circumstances as determined by the trial courts in that memorandum and opinion. So simply referring to the second sentence where the court says, makes reference to those two historical standards, does not suggest that the court did not look at the blank slate that came up previously. It was proper for the court, the district court, to reference those two historical standards because reliable fire doesn't throw everything up for grabs at this point. What reliable fire specifically says is that what a court is to look at, those two historical factors, which is the near permanent customer relationships and the historic case law with respect to those factors, still remains intact. So those are still clearly the things that the Illinois Supreme Court said are to be looked at when analyzing these cases and when analyzing the totality of the circumstances standard for the purpose of restrictive covenants. I think that goes to the question of there is not a blank slate here and I think there is some for predictability by the Illinois Supreme Court that should remain in these cases and that's why it specifically stated that historic case law remains intact. So the second part of the argument and I think getting to the question of what did the district court miss here, the district court did not miss anything here and there's no testimony, well the testimony referenced by counsel or in the briefs is testimony from instance principal, Ms. Borre, that was recitations of her testimony, which are not in the court's findings. So there's not a question or an appeal issue related to the court's factual findings. Those factual findings were many. Some of them included the non-exclusive relationships, the staffing firms using multiple firms, the fierce competition, the candidates using internet job boards and social media, Ms. Borre's testimony or recorded statement that the industry is commoditized and everyone's selling the same thing and that information is not the key to success. It's a volume business that the skills, counsel referred to skills, what the court said was what you need here is interpersonal skills and a strong work ethic. That's what this business is about. It's not on superior information. It talked about findings that for every 10 job openings, instant may place one candidate. So those placements are going to many others and the competitors in the industry. Mr. Wood, can I ask you, that talk by Ms. Borre about strong interpersonal skills and work ethic, that was the videotape, is that right? Well the videotape, Ms. Borre said it was commoditized business and people buy from people. What were the that was a presentation, a seminar type, but it was a presentation to an entrepreneurial club that it was recorded and publicly. It seems that some of the information that instance seeks to protect is not easily ascertainable by the public, like the hot candidate or roll-off list and information about the candidates skill sets. Why shouldn't we treat that information as established that the information was not available to the public. The lists that were presented were old lists, not for example, lists that somehow had been disseminated right before these individuals departed. So there was no evidence that these individuals even had roll-off lists or hot lists at the time of their departure. No one had seen them in any recent time. But the second part of that is that I think Judge Holderman found that those lists were available in generic information. This idea that it takes $10,000 a month. Yes, a company like CareerBuilder may charge $10,000 a month, but every company subscribing to those services in the industry, including Instant, it's readily available information. And in a roll-off list, for example, is when someone's coming off a job, that's the term, so someone's coming off a placement. Those individuals want to get placed again. So what those individuals are doing are putting their resumes out there on Dice or Monster or other, on LinkedIn, on those types of things to make it known, giving it to other staffing firms to make it known, hey, I want to be placed again. So the roll-off list is simply when someone's coming off a job and that's not protectable information at all. The hot candidate list, it had very generic, even the old ones that were presented, very generic information. There's reference to the database. Instant never even presented that database to the court. So there was testimony that that generic information is well available through public means, through the Dice, Monster, LinkedIn, but it also was never presented. So this information that they claim is so important and confidential was two lists that were presented to the court and the court determined one, that those weren't very persuasive, is substantial and information giving a competitive advantage. In this industry, what value do your clients or the plaintiff actually add to the process? What value do the... Well, I mean, we're being told that, you know, nobody has any loyalty to anybody. The same candidates are working with multiple placement firms. The same employers are working with multiple placement firms. What value do the placement firms add and how does an employer decide which placement firm to pay if it hires somebody who's listed with ten different placement firms? Well, on that last point, it would be the person who first placed the candidate to that client. So it's just the clock? It's the clock. So it's work ethic. Is that a custom in the industry? Yes. Yeah. So the first one to introduce the candidate to a client, and that client wants that candidate, that's where the sale's going to go. But those candidates are being placed by others. It is a timing issue. That's why it is work ethic and part of it is interpersonal skills and having those relationships where you're working hard to get those candidates as soon as possible. And that's the industry. And the suggestion that Instant was that the information should be protectable or the covenants should be enforceable because Connect Search was up and running within a few months. There was no... The testimony doesn't support that Instant was, for example, just a business to the size... Connect was to the size of Instant immediately. It doesn't suggest that at all. There was no testimony about that. They didn't support that. So to say it was just up and running in two months. Yeah, its doors were open in two months. That's it. And it took time, and it took effort, and it took... But it wasn't presented or established that someone else couldn't have done that same thing. In other words, that information is out there for people to start in the staffing business if they so choose. That's the nature of the consideration. Predictability is important, and the Fifield Court found that. The Fifield Court was correct in finding that. It determined that a promise of at-will employment is illusory unless there is substantial employment, and it determined that that is two years, and it actually determined that historically that's been looked at as two years. There's been a second case. Counsel referred to the Cumulus case, which was a central district of Illinois case. That refers to a more recent third district appellate court Illinois case of Prairie Rheumatology, and Prairie Rheumatology is also applied to the Fifield two-year bright line. So now there's two Illinois appellate districts that have recently applied the two-year bright line rule that predictability is important, and that substantial period of time means two years. And that doesn't mean an employer can't otherwise have an enforceable covenant. This is the situation where the only thing being offered by the employer is at-will employment. So an employer could offer other consideration. That's not what is contended here or in the Fifield case, and in those circumstances, it's two years. And it makes sense because if you're not offering anything but at-will employment, why would someone's one year or one and a half year or two years, those have to be treated differently because you're not offering anything else but employment, but at-will employment. So in that circumstance, so now two Illinois appellate courts in the most recent have said two years. Those are the best predictors of what the Illinois Supreme Court would do to say that reliable fire suggests that the court is moving towards a more of a totality of circumstance test. I don't think it's borne out by looking at reliable fire because reliable fire refers to two separate things. It refers to the totality of circumstances test applied to the legitimate business interest, and it has to have consideration. So it didn't conflate the two at all. Reliable fire keeps consideration as a separate element. I would also note that both Fifield and Prairie Rheumatology were after reliable fire, so those appellate courts in Illinois did not consider reliable fire as instructing those courts to apply a totality of circumstances or other tests to what it means to have a substantial period of employment. Last, I will address our counterclaim. We have a cross appeal on the counterclaim. We think, I think there's a pretty clear admission by Ms. Borre as a representative of Instant Technology that Ms. DeFazio was paid $10,000 towards a $42,000 bonus that she earned. We believe that that's an admission of the earning of that $42,000 bonus, therefore $32,000 of which remains unpaid, along with the interest and attorney's fees. And the contention that somehow the language in a letter agreement written by laypeople that said the bonus relates to this target and that target, when those targets have percentages on it, and those percentages, 35% of the total pool of $120,000 is $42,000, which Ms. Borre testified that bonus was earned by Ms. DeFazio. We think it's conclusive that Ms. DeFazio earned that bonus, and we'd ask for a reversal on that, on the counterclaim. Thank you. Thank you very much. The case is taken under advisement.